*In re* MARRIAGE OF WILLIAM S. KENNEDY, Petitioner and Counter-respondent-Appellant, and MARY JEAN KENNEDY, Respondent and Counterpetitioner-Appellee.

First District (1st Division)   Nos. 1—89—0605, 1—89—1761 cons.

Opinion filed May 28, 1991.

Paul J. Bargiel, of Chicago, for appellant.

Paul R. Jenen, of Wheeling, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal brought by petitioner/counterrespondent, William S. Kennedy, from a judgment for dissolution of marriage and from an order entered by the trial court which awarded partial payment of prospective appellate attorney fees to respondent/

852

counterpetitioner, Mary Jean Kennedy. On appeal, William contends that the trial court abused its discretion when it: (1) awarded 70% of the proceeds from the sale of the marital home to Mary Jean; (2) awarded monthly unallocated maintenance and support to Mary Jean in the amount of 36⅔% of William's monthly net pay or $525, whichever is greater; (3) found that William owed $3,175 in support arrearage;[1] and (4) awarded partial attorney fees to Mary Jean for both the trial and the appeal. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts. On September 20, 1984, William filed a petition for dissolution of marriage. Mary Jean filed a counterpetition. The couple had been married since April 25, 1959, and had five children. At the time the petitions were filed, three of the children were emancipated and two were minors. During the proceedings, Mary Jean remained living in the marital residence with the minor children.

On December 6, 1985, Mary Jean filed a petition for temporary maintenance and child support. Pursuant to an agreed order, entered January 15, 1986, William agreed to pay Mary Jean $600 per month in temporary maintenance and child support. Mary Jean was to be responsible for making the mortgage payments on the marital home and for paying for routine household expenses. At the time the agreed order was entered, Mary Jean had just started working full time for Palatine High School District 211 as a student supervisor, earning approximately $8,500 per year, and William was working full time as a pari-mutuel clerk at Chicago-area race tracks, earning approximately $45,000 per year.

Subsequently, on June 29, 1987, William filed a petition for modification of the temporary maintenance and support order on the grounds that one of the minor children had reached majority and that he had been released from his employment. William alleged that starting in May 1986, he had worked full time at Illini Hardware and part time at the race track, earning $32,788 that year. In May or June 1987, William was terminated from his position at Illini Hardware. He claimed that he attempted to work full time at the race track, but could not get the assignments he sought. Instead, he worked approximately five shifts per week at the race track. William explained that a shift is a series of 9 to 11 races with a duration of 5 to 5½ hours.

---

[1]We note that pursuant to the judgment for dissolution, William was ordered to pay $3,375 in support arrearage, not $3,175.

Prior to any ruling on the petition for modification, William unilaterally decreased his monthly payments to Mary Jean from $600 to $300, effective July 1, 1987.

The trial court ruled on William's petition for modification on February 16, 1988, as part of its oral pronouncement regarding the judgment for dissolution and disposition of marital property. Following hearings on William's objections to the trial court's oral pronouncements, the trial court entered the judgment for dissolution of marriage on February 6, 1989, which included, *inter alia*, the following findings:

"(1) William, age 51, presently worked at Maywood Race Track, earning net monthly wages of approximately $1448.73.

(2) Mary Jean, age 49, presently worked as a student advisor for the 10-month school year, earning approximately $9000 per year gross wages or $651 net monthly wages.

(3) Mary Jean lacks sufficient property to provide for her reasonable needs and is otherwise without sufficient income to provide for her support commensurate with the standard of living established during the long-term marriage.

(4) The parties have stipulated that it is in the minor son's best interests to be in the full care and custody of Mary Jean.

(5) The Continental Illinois Bank account in the names of Mary Jean, her father, and her brother is the property of Mary Jean's father and is not subject to division by the court."

Based on the trial court's findings, the judgment for dissolution ordered that, *inter alia*:

"(1) Mary Jean is granted sole care, custody, control and education of the minor son; William is granted reasonable visitation rights.

(2) Commencing September 19, 1988, William is to pay Mary Jean unallocated maintenance and child support in the sum of $525 per month or 36-2/3 percent of his monthly net income, whichever is greater. The award will be reviewable August 1992.

(3) William's petition for modification of child support is granted retroactive to July 1, 1987 and modified from $600 per month to $525 per month for the period from July 1, 1987 through September 19, 1988. As a result, William owes temporary support arrearages for that period in the sum of $3,375.

(4) Mary Jean is to have possession of the marital home until the minor son reaches majority (August 1992) or completes high school, whichever is later; or until Mary Jean remarries or

maintains a conjugal cohabitation with a male person; or until Mary Jean no longer resides in the marital home; at which time the marital home is to be listed for sale.

(5) Mary Jean is to pay the mortgage, real estate taxes, home owner's insurance, utilities, maintenance and repairs. When the house is sold, Mary Jean is to receive credit for the amount by which she reduced the principal and the remaining proceeds are to be divided 70 percent to Mary Jean and 30 percent to William.

(6) All bank account balances are to be divided equally.

(7) Mary Jean is to receive one-half of William's pension benefits pursuant to a formula based on duration of marriage and duration of William's employment.

(8) William is to contribute $2369.50 toward Mary Jean's trial attorney fees and court costs, and Mary Jean is to pay her attorney the balance of $4,719."

William's timely appeal from the judgment for dissolution followed. Thereafter, on April 10, 1989, Mary Jean filed a petition for prospective attorney fees for defense of the appeal. Following a hearing on Mary Jean's petition, the trial court ordered William to contribute $2,000 toward Mary Jean's appeal attorney fees, payable to her attorney at $100 per month without prejudice for Mary Jean to file a petition for full appellate attorney fees at the end of the appeal. William's timely appeal from the appellate fee order followed.

Initially, William contends that the trial court abused its discretion in awarding 70% of the proceeds from the sale of the marital home to Mary Jean because, absent countervailing factors, monetary contribution by the parties to the purchase and upkeep of the marital home should be determinative of the share of the proceeds awarded. Based on the undisputed facts that William had earned the money for the downpayment on the house, he had paid the mortgage, taxes, insurance, maintenance and utility bills, plus he had made repairs and had cut the grass, William contends that he should have been awarded a greater share of the proceeds. William further argues that Mary Jean contributed only homemaking skills and whatever extra money she earned in the last five years of their marriage had been used exclusively for her own needs. In response, Mary Jean argues that William has ignored the value of her homemaker skills as well as the disparity between their current incomes and their potential for income.

■■ Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1989, ch. 40, par. 503(d)) governs the distribution of marital property. Section 503(d) provides that the

court "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

    (1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

    (2) the value of the property set apart to each spouse;

    (3) the duration of the marriage;

    (4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

* * *

    (7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

* * *

    (9) whether the apportionment is in lieu of or in addition to maintenance;

    (10) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

    (11) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1989, ch. 40, par. 503(d).

  ■■ ■ The theory of marriage advanced by the Act is one of equal partnership. Thus, section 503 was intended to recognize and to compensate the homemaker as an equal partner to the marriage whose domestic contributions have assisted in giving economic value to the marital assets. (*In re Marriage of Gentry* (1989), 188 Ill. App. 3d 372, 544 N.E.2d 345.) Emphasis on monetary contributions should be avoided so as to obtain the ultimate objective of division of the property in just proportions. (*In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 411 N.E.2d 238; *In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748.) Further, the trial court has broad discretion in justly apportioning the marital assets, and its decision will not be disturbed absent a showing of abuse of discretion. In this context, an abuse of discretion is established if no reasonable person would reach a similar result. *In re Marriage of Kristie* (1987), 156 Ill. App. 3d 821, 510 N.E.2d 14.

■ In the present case, William correctly states the general rule of law that absent countervailing factors, monetary contributions of the parties determine the share of proceeds. However, that rule is inapplicable to the facts at bar because Mary Jean had presented evidence of countervailing factors, such as homemaking skills, to the trial court. In such a situation, monetary contribution is but one factor to be considered by the trial court. (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748.) Further, William's argument that the trial court's failure to enunciate a specific finding as to Mary Jean's homemaking contributions nullified that factor is contrary to the law. There is no requirement that the trial court set forth a finding as to all of the section 503(d) factors; it need merely consider them. (*In re Marriage of Fuggiti* (1985), 130 Ill. App. 3d 190, 474 N.E.2d 386.) The record clearly indicates that the trial court considered Mary Jeans' homemaking contributions as well as other factors in reaching its determination as to the disposition of marital assets.

Mary Jean testified that from the time she and William were married in 1959 to 1981, she was a full-time homemaker. In this capacity, she took care of the couple's five children, did all of the yard work, the laundry, the house cleaning, the shopping and the chauffeuring of the children to their various activities. In 1981, she worked two to three days per week at her brother's printing company. She used her earnings to buy things for the children or for gifts. In 1982-83, Mary Jean worked for American Greeting Card and contributed her earnings to the family. In 1985, Mary Jean commenced working at Palatine High School District 211 as a student supervisor for the 10-month school term. Mary Jean admitted on cross-examination that she had not contributed any money toward the downpayment on the marital home and that, prior to the filing of the petition for dissolution in 1984, William had paid all the costs related to the home and had made all the necessary repairs.

The trial court also heard testimony that William and Mary Jean had been married for 29 years; that William's net monthly earnings in 1987 were $1,448 and Mary Jean's net monthly earnings were $651. Further, William had 28 years of experience in the hardware business and had maintained a union card for 16 years which enabled him to work shifts as a pari-mutuel clerk at Chicago-area race tracks. Although Mary Jean also had a union card, she lacked seniority status to get work at the track; her card was limited to one race track; and her contact person at the track who had helped her get some work in the past was no longer there. At the time of the trial, the couple had

one minor child, custody of whom was given to Mary Jean; one emancipated child in college; and one emancipated child living at home. The minor child will reach majority on August 30, 1992.

Upon reviewing the relevant factors, the trial court entered the judgment for dissolution which included disposition of the marital assets. In reaching its decision as to the 70%/30% split in the marital home proceeds, the trial court noted the fluctuation in William's earnings and stated:

"[B]ased upon one's earning capacity as compared to a changed earning capacity, a considerable reduction in [William's] earnings required a change in the concept of the division of the marital property and the unallocated maintenance and support and what [I] was really saying to [Mary Jean] was I have to reduce the amount that you are going to get because you are going to need this until you build up *** additional items but I can't give it to you today. Since I can't give it to you today, the best I can do is provide for you in the future so you never achieve that. We can free the husband some duty to support you rather than having permanent alimony, so we will work a division of marital assets, to-wit, the house, by giving you ten percent more [than stated in the original pronouncement] and then, I believe, that the cut in the unallocated maintenance support for the period of time was an amount fairly close but maybe less than the additional increase on the value of the house."

Those cases relied upon by William to support his theory that the monetary contribution is the overriding factor in a determination as to distribution of marital home proceeds do not support that theory. In fact, the cases emphasize the importance of assessing all relevant factors, not just financial contributions. *In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 459 N.E.2d 1374 (the appellate court modified the trial court's order disposing of the assets on the ground that the trial court had failed to consider the husband's contributions and had granted all of the benefits of the marriage to the wife and imposed all the burdens on the husband); (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336 (the husband's greater percentage share of the assets was justified in light of the husband's greater contribution to the marital estate, the wife's greater share of property immediately capable of producing income, and the substantial value of the property awarded to the wife); *In re Marriage of Clearman* (1980), 85 Ill. App. 3d 584, 407 N.E.2d 189 (upon reviewing all the relevant factors, the appellate court reversed

the division of assets favoring the wife on the ground that, as a result of the debts assumed by the husband, the assets awarded to him had a negative value compared to a positive value of $65,620 for the assets awarded to the wife); *In re Marriage of Woodward* (1980), 83 Ill. App. 3d 253, 404 N.E.2d 575 (wife awarded marital home because she had contributed substantially more to the acquisition of the marital property and, due to her efforts, husband had been able to acquire a college degree, thereby increasing his future earning capacity); *In re Marriage of McMahon* (1980), 82 Ill. App. 3d 1126, 403 N.E.2d 730 (the trial court properly considered all of the statutory elements and found that the husband's greater contribution to the acquisition, preservation and appreciation in value of the parties' business, which was the principal marital asset, precluded an equal division of the estate and supported a 60%/40% division in the husband's favor); *In re Marriage of Gustke* (1979), 78 Ill. App. 3d 274, 397 N.E.2d 146 (wife properly awarded $18,000 cash plus one-half of the proceeds from the sale of the marital home on the grounds that both parties had approximately the same income, but the wife had contributed substantially more toward the purchase of the marital home.)

■ In the present case, in light of the parties' long marriage, the disparity in their incomes, the fact that William will reap the benefit of the home's appreciated value accrued during Mary Jean's possession (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748), and the tax benefit to William for the payment of unallocated maintenance and support, we conclude that the trial court did not abuse its discretion in awarding 70% of the proceeds from the sale of the marital home to Mary Jean.

■■ ■ Next, William argues that the award of unallocated maintenance and child support to Mary Jean in the amount of $36\frac{2}{3}\%$ of his monthly net income, but not less than $525, is excessive and constitutes an abuse of discretion. In raising this argument, William does not object to having to provide support for the minor child. Rather, his argument focuses on the facts as they relate to an award of maintenance. The determination of maintenance is governed by section 504(a) of the Act, which allows an award of maintenance only upon a finding by the court that the spouse seeking maintenance lacks sufficient property to provide for his or her reasonable needs, is either unable to support himself or herself through appropriate employment, or is otherwise without sufficient income. The trial court has wide discretion in determining what needs are reasonable and must decide the issue on a case-by-case basis, considering such factors as the standard of living during the marriage, the length of

the marriage, and the social position of the spouse seeking maintenance. (*In re Marriage of Kristie* (1987), 156 Ill. App. 3d 821, 510 N.E.2d 14.) Further, maintenance may be appropriate where a spouse is employed, but has little prospect of earning a salary commensurate with her needs. (*In re Marriage of Kristie*, 156 Ill. App. 3d 821, 510 N.E.2d 14.) The spouse receiving the maintenance need not consume his or her share of marital property to be entitled to maintenance. (*In re Marriage of Coram* (1980), 86 Ill. App. 3d 845, 408 N.E.2d 418.) Like the distribution of marital property, the trial court's award of maintenance will not be disturbed upon review absent evidence of abuse of discretion. (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748.) When the award is measured against the criteria of section 504(a), there is no abuse of discretion. *In re Marriage of Kristie*, 156 Ill. App. 3d 821, 510 N.E.2d 14.

In the present case, the trial court found that William's net monthly earnings were $1,448.73 and Mary Jean's net monthly earnings were $651. The court then calculated that Mary Jean had a monthly deficiency of $844. Although not specifically stated, this figure would have to have been based on a determination that her monthly expenses were $1,496. Regarding William, the trial court found that his monthly expenses were $500, leaving a surplus of $948.73. Based on these figures as well as other relevant section 504(a) factors, the trial court awarded Mary Jean monthly unallocated maintenance and child support of 36⅔% of William's net monthly income, but not less than $525. This award is reviewable in August 1992, when the minor son reaches majority.

■ William's contention that the trial court based the award on a finding that Mary Jean's monthly expenses were in excess of $2,400 is not supported by the record. Although the court initially made such a finding, it subsequently amended its finding upon realizing that Mary Jean had included several erroneous calculations. For example, she had listed her annual $900 car insurance payment for three cars, only one of which was hers, as a monthly expense. The trial court divided $900 by 3 and then divided $300 by 12 to arrive at the monthly car insurance expense.

William further argues that Mary Jean's monthly expenses included food, shelter and utility costs for their 25-year-old emancipated daughter and Mary Jean's father, who were living with Mary Jean. There is no evidence in the record that Mary Jean had purchased the food for her daughter and father, or that the utility costs increased as the result of their living with Mary Jean. Of course, the fact they re-

sided with her would not increase the monthly mortgage payment, real estate taxes or home owner's insurance.

■■ In addition, William argues that the trial court erred in not considering the monetary contributions made by the daughter and father to Mary Jean. The trial court heard testimony that the daughter had occasionally purchased items for the household and that Mary Jean's name was on her father's bank account, and concluded that there was not one "scintilla of evidence" that the father and daughter made regular monthly payments to Mary Jean. Their monetary contributions, if any, were infrequent and irregular. In our view, the record supports this conclusion.

William also argues that the trial court considered only what Mary Jean actually earned for a 10-month job at the local high school and not what she could have earned had she worked the additional two months of the year. Other than one summer when Mary Jean had worked at Arlington Park Race Track, there was no evidence that Mary Jean could find two-month's employment at will. Regarding the race track, Mary Jean testified that although she had a union card which would enable her to work at the track, her contact at the track was no longer there. As a result, without having union seniority at that track, the likelihood was remote that she would be selected to work part-time shifts. Further, unlike William, Mary Jean was limited to working only at Arlington Park Race Track because she had never worked at any other area tracks to establish the necessary seniority.

With respect to his own monthly expenses, William argues that the trial court incorrectly determined that his monthly expenses were $500. The record supports this contention. At trial, William testified that his average monthly expenses, excluding child support, were $920. This figure was not disputed. In addition, although not raised in William's brief, the trial court also erred in computing Mary Jean's monthly income. In its original oral pronouncement, the trial court found that Mary Jean was paid the net amount of $390 twice a month. It then calculated the monthly net income to be $651. At the hearing on his objections to the oral pronouncement, William brought the mathematical error to the trial court's attention, indicating that bimonthly checks of $390 would result in a monthly net of $780. The court admitted to the possibility of error, but never recalculated the amount in the final judgment.

■■ Thus, it would appear that the operative figures for a determination of maintenance are:

|                     | William        | Mary Jean        |
|---------------------|----------------|------------------|
| Monthly Net Income  | $1,448.73      | $ 780.00         |
| Monthly Expenses    | 920.00         | 1,496.00         |
|                     | $ 528.73 (surplus) | $ 716.00 (deficit) |

Even with the mathematical adjustments, we do not find that the trial court abused its discretion in awarding Mary Jean maintenance in the amount of 36²/₃% of William's monthly net income ($1,449 x 36²/₃% = $531), or not less than $525. None of the property awarded to Mary Jean was income producing or readily convertible to cash; Mary Jean needed the home and the outside funds to meet monthly expenses; and William was in a financial condition to meet his own expenses and to assist Mary Jean. (*In re Marriage of Coram* (1980), 86 Ill. App. 3d 845, 408 N.E.2d 418.) Thus, we conclude that the record supports the trial court's award of unallocated maintenance and child support, reviewable in August 1992, upon the minor child's reaching majority, and the trial court did not abuse its discretion.

██ Next, William argues that the trial court abused its discretion in finding that William owed support arrearages to Mary Jean. William claims that there is no reasonable basis for the court to have awarded unallocated maintenance and support retrospectively. However, William offers no citation to authority to support his position. William's failure to comply with Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(3)(7)) regarding citation to authorities waives this argument for review by this court. *In re Marriage of Wilson* (1990), 193 Ill. App. 3d 473, 549 N.E.2d 1348; *In re Marriage of Carey* (1989), 188 Ill. App. 3d 1040, 544 N.E.2d 1293.

██ Finally, William contends that the trial court abused its discretion by awarding Mary Jean partial attorney fees for the trial and for the appeal when Mary Jean failed to establish his ability to pay. As a general rule, the payment of attorney fees is the primary obligation of the party for whom the services are rendered. (*In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 507 N.E.2d 71.) However, pursuant to section 508 of the Act, upon consideration of the financial resources of the parties, the trial court, in its discretion, may order either spouse to pay a reasonable amount of the other spouse's attorney fees and costs actually incurred at trial or to be incurred on appeal. (Ill. Rev. Stat. 1989, ch. 40, par. 508.) The spouse seeking the fees and costs must establish financial inability to pay the fees as well as the financial ability of the other spouse to pay them. (*In re Marriage of Einhorn* (1988), 178 Ill. App. 3d 212, 533 N.E.2d 29.) Financial inability to pay does not require a showing of destitution nor does it re-

quire the fee-seeking spouse to divest himself or herself of capital assets. (*In re Marriage of Felson* (1988), 171 Ill. App. 3d 923, 525 N.E.2d 1103.) Rather, financial inability exists where to enforce payment of available funds would strip the person of his or her means of support and undermine his or her economic stability. (*In re Marriage of Garelick* (1988), 168 Ill. App. 3d 321, 522 N.E.2d 738.) The decision regarding attorney fees is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *In re Marriage of Einhorn* (1988), 178 Ill. App. 3d 212, 533 N.E.2d 29.

Regarding the award of partial attorney fees to Mary Jean for the trial, the judgment for dissolution ordered William to contribute $2,369.50 toward Mary Jean's attorney fees and court costs, and ordered Mary Jean to pay the balance of $4,719. The record before this court does not contain a transcript of the proceedings for the hearing on Mary Jean's petition for attorney fees incurred for the trial. However, the trial court had before it evidence of the parties' relative economic positions during litigation and of William's greater ability to acquire assets in the future. Based on these considerations, the trial court found that William had a monthly earning surplus and Mary Jean had a monthly earning deficit.

■■■ On appeal, William contends that when his monthly maintenance obligation of $525 is included, his surplus is reduced to almost nothing. Although this is supported by the record, the trial court also noted that William receives annual Federal tax refunds in excess of $2,000, and, at the time of trial, was only working half a day three to four days per week. The evidence established that a full-time schedule of employment at the race track was possible. Considering that William had the ready ability to increase his income if he needed to do so by working a regular 40-hour work week, and that Mary Jean, already working full time, although on a 10-month basis, had no prospects of increasing her salary, we conclude that the trial court did not abuse its discretion in awarding partial trial attorney fees to Mary Jean.

■■■ Regarding prospective appellate attorney fees, at the hearing on Mary Jean's petition, Mary Jean testified that her current monthly expenses were approximately the same as they had been during the trial, *i.e.*, $1,496. She further stated that she cannot afford to pay more than $20 to $25 per month for her attorney fees of $4,719 incurred for the trial. She indicated that her total gross wages for the current year, including part-time summer employment between school terms, would be approximately $11,500. With the maintenance check

of approximately $600 per month, Mary Jean would still have a monthly deficit in excess of $200.

William then testified as an adverse witness and stated that his gross monthly wages were $2,490 or $29,880 per year. He also indicated that he had already paid his appellate attorney a $2,500 retainer, plus $400 for costs, part of which was borrowed and part of which came from his income tax refund. On direct, William testified that his IRA account of $3,200 had been garnished by Mary Jean's trial attorney for payment of his portion of Mary Jean's trial attorney fees of $2,369. In addition, he had incurred additional debts of $5,665 in dentist bills for himself, $200 of which will be paid by insurance; $205.80 in dentist bills for his son; $2,750 for his own trial attorney fees; a $1,200 loan; and $3,500 for his own appellate attorney.

Upon hearing all of the evidence, the trial court ordered William to contribute $2,000 toward Mary Jean's appellate attorney fees, payable at $100 per month. In reaching this determination, the trial court stated:

"[William] contends that his net monthly income is $981 a month, and his monthly living expenses are $991. Hence he has a shortfall of $10 a month; hence he cannot make any contribution to [Mary Jean's] prospective attorney's fees on the appeal that he has filed.

* * *

In the meantime [Mary Jean], who has an income of some $11,500 gross, plus the $800[2] a month, *** which is $9,600, payable in the unallocated support and maintenance, would give her a total income, gross income of approximately $21,100, for which she has to pay the income tax on that full amount.

The $800 that [William] pays as unallocated support and maintenance of course is not taxable to him.

He lists on his payroll stub one dependent. And he lists as his expenses the $800, totally ignoring the substantial benefit that he would receive if he correctly showed the dependence of the children or somebody else that would increase the amount of money that he would have per month.

As it is, he doesn't do this. In the last year he received a refund of $2400, which comes to about $200 a month.

---

[2]We note that William's contention that he pays $800 per month in unallocated maintenance and child support, if true, is in excess of the trial court's order ordering William to pay 36⅔% of his monthly net income or $525, whichever is greater, unless the $800 payment includes other obligations.

It is argued that his tax refund in the future will be substantially greater because instead of using $400 as a—that may have been a non-deductible item. I don't recall if that was plain support or support and alimony.

But in any event, it would be a greater deduction when he takes the $800 off, plus he now has the benefit of interest and real estate taxes.

There was no evidence in the course of the hearing, but in the closing arguments it was stated that this would increase his tax refund or decrease his monthly taxes for income by $383.

I have no knowledge if that is anywhere near accurate. There was no evidence as to that. But the Court was aware as to evidence provided that there was an overpayment of income tax, which would increase the amount of net income he has available for spending during the course of the year."

Accordingly, based upon the disparity in the parties' incomes, the disparity in their income potential and the tax benefits to William, we conclude that the trial court did not abuse its discretion in awarding partial trial and appellate attorney fees to Mary Jean.

For the aforementioned reasons, the judgments of the trial court are affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.