2025 IL App (2d) 240466-U
No. 2-24-0466
Order filed July 16, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | |
| JOHN PAUL, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-DC-95 |
| | ) | |
| JENNIFER PAUL, | ) | Honorable |
| | ) | Carlo D. Colosimo, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in allocating responsibility for certain liens and judgments on the marital property solely to Petitioner-Appellant, John Paul. The trial court's calculation of John Paul's income was not against the manifest weight of the evidence. The trial court erred in ordering John to contribute to Jennifer's attorney's fees where Jennifer did not file a petition for contribution pursuant to 750 ILCS 5/503(j) or 750 ILCS 5/508(a) and where Jennifer did not enter into evidence any time records or itemized attorney fee statements.

¶ 2    At issue here is whether the trial court erred in (1) allocating responsibility for certain liens and judgments on the marital property solely to Petitioner-Appellant, John Paul; (2) calculating

John Paul's income; and (3) ordering John to contribute to Jennifer's attorney's fees. For the following reasons, we affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4      Petitioner-Appellant, John Paul, and Respondent-Appellee, Jennifer Paul, were married on July 17, 2004. Three children were born of the marriage. On May 23, 2022, John filed a petition for dissolution of marriage. Jennifer filed a counter-petition on September 20, 2022.

¶ 5      On April 2, 2024, Jennifer filed a notice of intent to claim dissipation, alleging that John dissipated $450,000 of her inheritance funds, $75,000 in rental payments, and earnings from the sale of various vehicles. However, during the trial, Jennifer's counsel indicated that they would no longer be pursuing the dissipation claim.

¶ 6      The matter proceeded to trial on May 2, 2024, May 3, 2024, and June 4, 2024.[1] John and Jennifer both testified. Forty-one exhibits were admitted by stipulation. The relevant testimony and exhibits are summarized below.

¶ 7                                *John Paul's Testimony*

¶ 8      John Paul testified that he and Jennifer were married on July 17, 2004. Since then, irreconcilable differences had arisen in his and Jennifer's marriage, and reconciliation would not

---

[1] On May 31, 2024, Chad Brody filed an emergency motion to intervene in the divorce action. On March 18, 2024, he had filed a verified complaint to foreclose the judgment lien on the marital residence (see Kendall County Case No. 24-FC-53). Due to the judgment lien attached to the marital property, Chad had an *in-rem* interest in the marital property that could be negatively impacted by the distribution or disposition of said marital property. Over the objection of both parties, the trial court granted the motion on June 7, 2024. However, it was noted that both parties agreed to sell the property.

be in the best interest of the parties. During the marriage, they had three children aged 18, 16, and 15. He also had another child from a previous marriage, aged 28.

¶ 9    John testified that his highest degree of education was a bachelor's degree in fire science. He worked as a firefighter paramedic for the City of Aurora but retired from the department in 2015. He receives a monthly pension in the amount of $4,760.92.

¶ 10    Currently, John is employed by Permix North America (hereinafter, "Permix") as the "CEO managing director." He has been employed there since May 2019. The company is owned by Arie Srugo, who resides in Israel. John is paid once monthly in the amount of $6,500 via wire transfer from a Bank of America account. However, if the "sales aren't there," he won't be paid. There were certain months in 2023 and 2022 when John received no payment, which is why his 1099 for each year showed his compensation as $61,500 and $67,336 respectively. He also receives commission and reimbursement for expenses from Permix.

¶ 11    Fuxion MME LLC was another company John was involved with. It was founded by Arie Srugo in 2019 to sell auxiliary equipment for Permix mixers. "[A]ny auxiliary equipment sold with the Permix was sold under Fuxion." When asked if he received income from Fuxion, John indicated he did not know and would have to check. Counsel approached with Petitioner's Exhibit No. 6, which was John's USAA Bank Account Summary for his checking account, showing only transactions from Fuxion MME. The exhibit showed bi-weekly paychecks from Fuxion in the amount of $3,750, as well as reimbursements in varying amounts.

¶ 12    Fuxion was only in operation for six months. It is not currently operating but exists as a registered company as they have registered trademarks. Though John originally testified that Fuxion was founded in 2019 and only operated for 6 months, he later testified that Fuxion was operating in 2022 as well.

¶ 13    John also was involved with Firex USA. He was the "CEO managing director" for the company. No further information regarding Firex was included in John's testimony.

¶ 14    During the marriage, John owned a business called Processing Resources International. He acted as the "CEO managing director." He testified that Jennifer also owned the company and acted as CFO, handling all the company's finances. The business was in existence from 2013 to 2018. He has no access to any of the old company records as it was sold in 2018 and Jennifer and the accountant had primary responsibility for the financial records.

¶ 15    Next, John testified about his most recent financial affidavit, which was admitted as Petitioner's Exhibit No. 1. The affidavit, dated February 26, 2024, lists his monthly income as $11,260 ($6,500 from regular employment and $4,760 from pension). It also indicates that John is contributing $2,770 to the monthly expenses of the marital home. The monthly expenses for his residence total $6,271. John testified that no one is assisting him in paying rent or utilities. The affidavit also lists monthly transportation expenses in the amount of $224, monthly personal expenses in the amount of $1,456, and monthly minor and dependent children expenses in the amount of $3,440. For debts, the affidavit lists IRS debt for past due taxes in the amount of $15,096 and Illinois Department of Revenue debt in an unspecified amount. The affidavit also indicates that John filed for Chapter 7 bankruptcy in December 2022.

¶ 16    According to the affidavit, John's assets include an Ally Bank account, a USAA Bank savings account, a USAA Bank checking account, and several vehicles for which he does not list a fair market value (a 2013 Ford Raptor, a 2014 Maserati Ghibli, a 2013 BMW, and a 2018 Ford Mustang). John testified that the account balances fluctuated month to month and that the Ally Bank account is primarily used for expenses incurred by the company. He denied having any other bank accounts outside of those three.

¶ 17    John then testified regarding the real property. He believed the value to be around $950,000 to $980,000. Although there was no mortgage, the property was encumbered by many liens. One lien, held by Fifth-Third, was for a loan Jennifer took out on the house related to a settlement agreement arising from a lawsuit with Fifth-Third. Jennifer discussed the loan with him prior to finalizing it. The security agreement was later admitted as Respondent's Exhibit No. 10 and shows that both Jennifer and John Paul signed the document.

¶ 18    John testified that he was unsure of the total amount of the liens encumbering the property. Several of the liens were the result of a failure to pay payroll taxes for employees of Processing Resources International. Petitioners Exhibit No. 17 was referenced, which was a collection of notices from the Internal Revenue Service regarding past due taxes. John's name was the only name listed on these notices.

¶ 19    John also testified regarding the existence of the following liens: (1) a lien in the amount of $12,750.08 from On Deck Capital Incorporated, which resulted from Processing Resources taking out a loan; (2) two liens in the amount of $3,905.30 and $1,740.72 from the Illinois Department of Security from Firex USA LLC, which both resulted from a failure to pay payroll taxes for Firex USA LLC; (3) a judgment lien in the amount of $663,496.60 from Chad Brody, which resulted from John's failure to repay Chad for a loan. John testified that he did not know about the lien in the amount of $8,826.77 from Calvary SPV nor the lien in the amount of $15,140.18 from JP Morgan Chase Bank.  John testified that he wanted the court to allocate all the IRS liens to him.

¶ 20    John testified that during the marriage, Jennifer handled the finances. She paid the bills out of a joint PNC account. He testified that both his and Jennifer's income went into the joint account.

¶ 21    Regarding Jennifer's work history, John testified that she was employed for part of their marriage, but he was unsure of when. She worked as the CEO of one company, the owner of Design Processing Resources, and the CFO of "the other company." John did not specify what company she was the CEO of, or what constituted "the other company." He further testified that he was unsure if Jennifer was working currently, but she was in good health and there was nothing that would prevent her from working currently. He also testified that he believed she was receiving financial assistance from her current boyfriend but was unable to say why he believed that. Ultimately, John believed both he and Jennifer were self-supporting. Therefore, he requested the court enter an order waiving maintenance for both parties.

¶ 22    For child support, John requested the court set child support guidelines pursuant to the statute with his income at $6,500 per month and Jennifer's at $5,495.

¶ 23    Throughout John's testimony, and especially on cross-examination, it became clear that he failed to tender significant amounts of discovery. Between the first and second day of trial, John's counsel tendered the missing discovery via email. John testified that he had previously provided everything to his attorney.

¶ 24    During John's cross-examination, counsel attempted to have John identify payments from Permix on his bank statements for his USAA checking account. He was unable to do so. He also testified that there is no other account that Permix would deposit money into. Further, he testified that it was possible a $17,189.23 deposit on February 10, 2022, could have been from Permix, but he did not know.

¶ 25    John's testimony on cross-examination regarding Fuxion was also confusing. He testified that he did receive payments from Fuxion, despite previously testifying he did not receive income

from Fuxion. See *supra* ¶ 11. However, he testified that on his taxes and on any financial affidavits he just recorded income from Permix.

¶ 26    John also testified on cross-examination that he failed to list his Mercedes as an asset in his June 26, 2022, financial affidavit. He testified that this was because he had a loan on the vehicle, therefore it wasn't an asset. However, the financial affidavit form does list a column for "Balance Due" in the subsection for motor vehicles.

¶ 27    On the February 1, 2023, financial affidavit, John listed as an asset the Mercedes with a balance due, along with a Hummer H3. He is unsure when he acquired the Hummer but testified that it was acquired with funds from his savings account.

¶ 28    Another discrepancy in John's financial affidavits was uncovered during cross-examination. Despite testifying that he only had three bank accounts, on the November 20, 2023, financial affidavit, John lists a fourth account, a Bank of America checking account. He testified that he did not tender that account in discovery and that it was a corporate account that did have his name on it. He was unsure when it was opened, but the account was still open as of the date of the trial.

¶ 29    Counsel then referenced Respondent's Exhibits 6a and 6b, which memorialized the Calvary SPV and the JP Morgan Chase liens in the amount of $8,826.77 and $15,140.18, respectively. John again denied knowing of these liens but acknowledged that he alone is listed on the documents, not Jennifer. Counsel then referred to John's bankruptcy petition, where he listed those debts.

¶ 30    Regarding his current residence, John had previously testified that no one was helping him pay rent or utilities. On cross-examination, he testified that Permix has made rental payments for him on months that he did not collect a paycheck. He did not tender any proof of this in discovery.

¶ 31    John also testified on cross-examination that Permix pays for a house in Texas for his adult daughter, who is a project manager for Permix.

¶ 32    Throughout John's testimony on re-direct and re-cross examination, it again became evident that certain documentation was not tendered in discovery. The parties recessed to try and resolve the issue. Upon return, there were no further questions for John, and Jennifer was called to testify next.

¶ 33                    *Jennifer Paul's Testimony*

¶ 34    Jennifer testified that her highest degree of education is a bachelor's degree in elementary education. Currently, she is employed by Insurion as an associate account manager. She had been employed there since July 17, 2023, and makes roughly $60,000 per year. This number includes her base salary plus commission.

¶ 35    Jennifer testified that she currently resides in the marital property with her children. She pays the monthly mortgage in the amount of $1,420.57.[2] John pays the utilities on the home.

¶ 36    Regarding Processing Resources, Jennifer acknowledged that this was a business formed during their marriage. However, she denied owning it. She testified she was the CFO "on paper," but had very limited involvement with the company. She was a part-time employee who signed checks when John was not in the office, helped provide invoices to clients, helped get part orders together, and helped with some digital marketing.

---

[2] Jennifer references paying the mortgage on the marital home, despite John's testimony that there was no mortgage on the home. To clarify, Jennifer is referring to the Fifth-Third lien here, which was classified as a mortgage.

¶ 37    Jennifer then testified that the Fifth-Third loan was related to a company she and John started in 2004. She did not testify as to the name of that company. Her role was CEO "on paper." She testified that her role with that company was also very limited.

¶ 38    Regarding the liens on the marital property, Jennifer testified that she had no idea of the existence of many of them until she put the property up for sale.

¶ 39    On cross-examination, Jennifer testified that she believed John had an ownership interest in Permix. She believed this because, pursuant to Respondent's Exhibit No. 11, an undated employment agreement between Permix and John, John would receive a commission for the sale of the company. She additionally believed that John was making considerably more than the $6,500 per month from Permix he testified to, as he also received commission for each sale. Jennifer testified that she believed John had an ownership interest in Fuxion as well. Also, she believes he started a new company called Permix Americas LLC in August 2023.

¶ 40    Jennifer testified that she believed the mortgage payment Permix was paying for John's daughter was approximately $5,000 per month. This was based on a rental listing she found. John never disclosed any documentation related to this property.

¶ 41    Regarding the Bank of America account that John testified was a company account (see *supra* ¶ 28), Jennifer testified that her son had needed tires and asked John for money. The son then received a "Zelle" payment from Permix North America LLC in the amount of $2,810. Respondent's Exhibit No. 26 was admitted, showing the transaction. Jennifer testified that she believes this shows that John has an ownership interest in Permix as he has immediate access to the bank account.

¶ 42    Finally, Jennifer testified to what she believed John's true income to be. Respondent's Exhibit No. 25 showed what those calculations were: (1) $6,500 monthly from Permix; (2) $475

weekly from Permix; (3) $4,760.72 monthly from John's pension; (4) $3,750 monthly from Permix for John's rent; and (5) $5,000 monthly from Permix for John's daughter's rent. This amount totaled $264,831.04 per year. Respondent's Exhibit No. 25 also included a total of unidentified wire transfers into John's account. Jennifer argued that these wire transfers qualify as income as well, and the court should attribute an additional $202,429.96 to John's income to account for the wires. This would bring John's income total to $467,261.

¶ 43     After Jennifer's testimony concluded, both parties rested. The trial court gave the parties until June 14, 2024, to submit written closing arguments.

¶ 44     The trial court entered the divorce judgment on July 17, 2024. It reads, in relevant part, as follows:

>     "THIS CAUSE coming on to be herd [*sic*] for a three (3) day Trial, on the dates of May 2, 2024, May 3, 2024, June 7, 2024, *** and the Court having jurisdiction of the parties and the subject matter and having heard due testimony of the parties' and after weighing all of the relevant evidence herby [*sic*] finds:
>
> * * *
>
>     2.1     The pinnacle issue in this case has been the determination of income of the parties. The court took a great deal of time listening to the testimony of the parties, watching their demeanor during their testimony as well as when they were not testifying, reviewing the exhibits submitted throughout the trial, and reviewing the comprehensive closing arguments of the parties.
>
>     2.2.     The court has considered all statutory factors.
>
>     2.3     John Paul's testimony that his income is $6,500.00 per month or $78,000.00 per year is completely without any merit or believability. Throughout his

entire testimony John Paul repeatedly attempted to mislead this court. John Paul holds the position of CEO and Managing Director of Permix, LLC. Although Jennifer Brody-Paul attempted to establish that he owns this company, this court cannot find that he has an ownership interest in the company. However, the court finds that John Paul has almost unilateral authority and access to the company, its decisions, its management, and most importantly access to the company's finances, from which he has nearly unlimited control. John Paul attempted to mislead this court when he testified that his salary from Permix, LLC was limited to a $6,500.00 monthly income. By competent evidence, exhibits and testimony Jennifer Brody-Paul established that is not the case. John Paul's income far exceeds his claimed income. It should be noted that John Paul did not make a full disclosure of his accounts. Several times during his testimony John Paul testified of certain payments or deposits that were not listed in any of his disclosed accounts. When asked from where the monies were paid or to where they were deposited, he would answer that he did not recall. It is clear to the court that other accounts exist but have not been disclosed by John Paul. John Paul claims his income is $78,000.00 per year. Jennifer Brody-Paul claims that John Paul's income is $467,261.03. This court cannot think of a previous case in which the parties were so far apart in their position on someone's income. The court finds the following items to be income for the purpose of calculating John Paul's maintenance and child support obligations:

|  | | Monthly | Annually |
|---|---|---|---|
| i. | Monthly payment from Permix, LLC: | $6,500.00 | $78,000.00 |
| ii. | $475.00 weekly payments from Permix, LLC: | $2,058.33 | $24,700.00 |
| iii. | Monthly payments for his daughter's home | | |

- 11 -

|  | | | |
|---|---|---|---|
| | paid out of company accounts: | $5,000.00 | $60,000.00 |
| iv. | Rent payments for John Paul by Permix, LLC: | $3,750.00 | $45,000.00 |
| v. | Fireman's Pension Payments: | $4,760.72 | $57,131.04 |
| vi. | Miscellaneous deposits, that are not transfers from savings account (average): | Various | $96,597.05 |

Taking into consideration that the Fireman's pension will be divided equally between the parties, John Paul's income for the purpose of calculating child support and maintenance will be reduced by $28,565.52 which represents one-half of the Fireman's Pension. Conversely, $28,565.52 will be added to Jennifer Brody-Paul's income for purposes of said calculations. The court find [*sic*] that the respective incomes of the parties are as follows:

Jennifer Brody-Paul:        $60,000.00 + $28,565.72        $88,565.52/annually

John Paul:        $78,000.00 + $24,700.00 + 60,000.00 +

$45,000.00 + $28,565.52 + $96,597.05        $332,862.57/annually

\* \* \*

9.1 <u>Marital Residence located at 27 Settlers Lane, Oswego, Illinois:</u> The parties acknowledge and agree that they own a marital residence located at 27 Settlers Lane, Oswego, Illinois. The parties acknowledge the house is titled jointly, and that both are named on the mortgage. John Paul has had Judgments and several liens, to be placed against the marital residence. The liens and judgments that are placed against the marital residence shall be the sole responsibility of John Paul, and he shall further hold Jennifer Brody-Paul free, harmless, and indemnified from all liabilities related thereto or resulting therefrom, including all attorney's fees and costs that may have incurred.

\* \* \*

(d) The property has the following liens/Judgments filed against it:

- The Following lien is joint and to be divided equally between the parties:

    - Fifth Third Bank in the amount of $163,013.89;

- The remaining liens/Judgments on the property are the sole responsibility of John Paul:

    - IL Department of Revenue in the amount of $2,167.19;

    - USA Internal Revenue Tax Lien in the amount of $92,535.77;

    - USA Internal Revenue Tax Lien in the amount of $15,404.64;

    - USA Internal Revenue Tax Lien in the amount of $7,845.21;

    - IL Department of Revenue Tax Lien in the amount of $19,889.30;

    - IL Department of Revenue Tax Lien in the amount of $27,399.97

    - Abstract Judgment Chad Brody in the amount of $663,496.60

    - Calvary SPV I, LLC: $8,826.77

    - J.P. Morgan Chase Bank: $15,140.18

    - IL Department of Employment Security, Firex: $1,740.72

    - IL Department of Employment Security, Firex: $3,905.30

- IL Department of Revenue Bulear Builders: $20,459.82

- The remaining liens/Judgments on the property are the sole responsibility of Jennifer Paul:

    - Hope Nickel, GAL, Jennifer Brody: $4,453.44

    - McSwain Nagle Geise & Rapp, Jennifer Brody: $6,259

\*\*\*

(f) The equity due to Jennifer Brody-Paul shall be determined as follows:

- Net proceeds, after traditional closing costs but prior to the payment of liens on the property minus 50% of the balance of the Fifth Third Loan with a current balance of $163,013.89 = her equity. Thereafter the full amount of the GAL lien and the McSwain, Nagle, Geise & Rapp lien shall be subtracted from her equity to give her the final equity owed to her. The amount of debt from the various liens and Judgments assigned to John Paul greatly exceeds what would be his 50% share of the equity.

(g) The amount owed to Jennifer shall be secured through the completion of a QILDRO against John's firefighter's pension, and the total sum owed to Jennifer shall be repaid within the thirty (30) days of the date of sale. The QILDRO shall be signed and entered by the Court Prior to the closing on the sale of the house.

(h) Within seven (7) days of the closing, Jennifer shall be tendered fifty thousand dollars ($50,000). The remaining balance shall be paid to her within thirty (30) days of the sale of the residence.

* * *

11.1 Based on the inequitable income of the parties throughout these proceedings, John Paul is hereby ordered to contribute the sum of TEN THOUSAND DOLLARS ($10,000.00) towards the attorney's fees of Jennifer Brody-Paul. Said payment shall be made within sixty (60) days of the entry of this order. Payment shall be made directly to O'Dekirk, Allred & Rhodes, LLC, 58 E. Clinton Street, 5th Floor, Joliet, Illinois 60432.

* * *

14.2 This is a final judgment of the court and there is no reason for delaying either enforcement or appeal of both."

¶ 45    On July 25, 2024, Jennifer filed an emergency motion to clarify the trial court's order, seeking to clarify whether pursuant to page 18, paragraph (h) of the order, John needed to pay her $50,000 within 7 days of the closing or within 7 days of entry of the divorce judgment. It was deemed not an emergency and set for hearing on August 16, 2024. Jennifer then filed a second emergency motion to clarify on August 9, 2024, seeking the same relief and reiterating her dire financial circumstances. John filed his notice of appeal on August 14, 2024.[3] Additionally, he

---

[3] Although Jennifer filed a motion to clarify, this did not constitute a postjudgment motion that would extend the time for filing a notice of appeal. A postjudgment motion only extends the time for filing only when it seeks rehearing, retrial, modification, or vacation of the judgment, or other similar relief. See *In re Estate of Russell*, 372 Ill. App. 3d 591, 594. Therefore, the timeliness of John's notice of appeal was not impacted by Jennfier's motions. We additionally note that, although there are multiple pending claims between the parties, the trial court included an express written Rule 304(a) finding. See *supra* ¶ 44. Accordingly, we have jurisdiction. See *In re Marriage of Valkiunas*, 389 Ill. App. 3d 965, 968 (2008).

objected to both of Jennifer's motions on August 28, 2024, and filed a motion for a Rule 305(b) stay on August 27, 2024.

¶ 46    Jennifer then filed an emergency petition for indirect civil contempt on August 29, 2024. In it, she argued that John was refusing to execute the listing agreement as required by the divorce judgment.

¶ 47    On September 11, 2024, Jennifer filed a motion to compel John to pay his 50% of the marital debt as required by page 22, article X, paragraph 10.1 of the divorce judgment. On September 17, 2024, Jennifer filed another emergency petition for indirect civil contempt. She again argued that John was refusing to execute the listing agreement as required by the divorce judgment. A rule to show cause entered against John on September 20, 2024.

¶ 48    Nothing further was included in the record on appeal. However, the Kendall County Circuit Clerk's Online Court Records show that there has been extensive ongoing post-dissolution litigation.

¶ 49                                    II. ANALYSIS

¶ 50    At issue in this appeal is whether the trial court erred in (1) allocating certain liens and judgments on the marital property solely to Petitioner-Appellant, John Paul; (2) calculating John Paul's income; and (3) ordering John to contribute to Jennifer's attorney's fees. Each issue will be analyzed in turn.

¶ 51    John first argues that the method by which the trial court allocated responsibility for the liens on the marital property amounted to *de facto* dissipation. We disagree. Dissipation is governed by 750 ILCS 5/503(d)(2), which reads as follows:

> "[The court] shall divide the marital property without regard to marital misconduct
>
> in just proportions considering all relevant factors, including:

(2) the dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions:

(i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;

(ii) the notice of intent to claim dissipation shall contain, at minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred;

(iii) a certificate of service of the notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules;

(iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage." 750 ILCS 5/503(d)(2) (West 2024).

¶ 52    Here, although Jennifer did file a notice of intent to claim dissipation, it had nothing to do with the liens on the marital property and was also withdrawn. John cites no cases where a reviewing court has found dissipation where no intent to claim dissipation was filed and where the trial court failed to even use the word dissipation in its final order. We do not find this argument persuasive.

¶ 53    The trial court's allocation of responsibility for the liens on the marital property amounted to allocation of marital property. We will not disturb the trial court's allocation of marital property absent an abuse of discretion. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 175. An abuse of

discretion occurs where no reasonable person would have distributed the property as the trial court. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 649.

¶ 54     The division of marital property should be equitable, not necessarily equal. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 175. Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (hereinafter, "the Act") provides that the trial court "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2024). The 12 factors include: (1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit; (2) the dissipation by each party of the marital or non-marital property; (3) the value of the property assigned to each spouse; (4) the duration of the marriage; (5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children; (6) any obligations and rights arising from a prior marriage of either party; (7) any prenuptial or postnuptial agreement of the parties; (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (9) the custodial provisions for any children; (10) whether the apportionment is in lieu of or in addition to maintenance; (11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and (12) the tax consequences of the property division upon the respective economic circumstances of the parties. 750 ILCS 5/503(d)(1)-(12) (West 2024). The trial court need not make specific findings as to each of these factors. *In re Marriage of Benz*, 165 Ill. Ap. 3d 273, 288. Further, there is no obligation on the part of the trial court to make specific findings as to the reasons for its award. *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 966.

¶ 55     Here, there is evidence in the record that supports the trial court's allocation. Regarding the first factor, John clearly decreased the value of the marital home. John was solely named on the Chad Brody lien, the IRS liens, the Illinois Department of Revenue tax liens, the Calvary SPV lien, the JP Morgan Chase lien, and the Illinois Department of Employment Security liens. Further, John testified that he was solely responsible for the tax liens. Jennifer testified to her limited involvement in the business ventures and her lack of knowledge as to a majority of the liens on the home, which the trial court found to be credible.

¶ 56     Regarding factors number 8 and 11— the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties and the reasonable opportunity of each spouse for future acquisition of capital assets and income— the record clearly shows that John has superior ability to Jennifer to acquire future assets and income. He has extensive experience as a CEO and certainly a higher income than Jennifer. She, on the other hand, has limited office experience, working in more administrative roles that have lower potential salaries.

¶ 57     John cites to *In re Marriage of Calisoff* to support his contention that the allocation of responsibility for the liens was inequitable. In *IRMO Calisoff*, the trial court awarded the wife $168,900 in marital assets and the husband only $37,390 and $63,000 of the debt. The *Calisoff* court found this to be an abuse of discretion, reasoning that the respondent was not put in a position from which he could start anew. *In re Marriage of Calisoff*, 176 Ill. App. 3d 721, 726. It further held that a large disparity in parties' earning capacities does not warrant granting all the benefits of the marriage to one party and imposing all of its burdens on the other. *Id.* Here, the trial court did not grant *all* the benefits to one party while imposing all of the burdens on the other. On the contrary, John retained a significant amount of assets, including: a 2013 Ford Raptor, a 2013

BMW, a 2018 Ford Mustang, a 2014 Maserati Ghibli, his Ally Bank account, his USAA Bank savings account, his USAA Bank checking account, his Aurora Firefighter Pension (less Jennifer's 50% of the marital portion of the benefits, to be determined pursuant to the HUNT formula), and his ADP Retirement Account (less Jennifer's 50% of the marital portion of the benefits, to be determined pursuant to the HUNT formula). Further, the trial court *did* impose burdens on Jennifer. She was allocated responsibility for 50% of the Fifth Third lien, the Hope Nickel GAL lien, the McSwain Nagle Geise & Rapp lien, and 50% responsibility for her credit card and medical debt, totaling $48,709.03. In looking at the entirety of the record, it is clear that John is still in a position from where he can start anew. Accordingly, the trial court did not abuse its discretion in allocating responsibility for the liens on the marital property as it did.

¶ 58    Additionally, section 503(i) of the Act allows the court to "make such judgments affecting the marital property as may be just and may enforce such judgments by ordering a sale of marital property, *with the proceeds therefrom to be applied as determined by the court.*" (Emphasis added.) 750 ILCS 5/503(i) (West 2024). Here, the trial court ordered the property sold, as was the agreement of the parties. It then, in its discretion, determined how the proceeds were to be applied based on the totality of the evidence. This is similar to how the court handled a lien on the marital property in *In re Marriage of Los*. In *IRMO Los*, the trial court ordered the sale of the marital home with net proceeds (after the mortgage had been paid off) to be distributed 60% to respondent (approximately $18,700) and 40% to petitioner (approximately 12,500). *In re Marriage of Los*, 136 Ill. App. 3d 26, 30. In addition to the mortgage, there was a $20,000 lien on the property. *Id.* The trial court allocated responsibility for that lien entirely to petitioner, despite the amount of the lien being more than his portion of the net proceeds. *Id.* Merely because the trial court allocated responsibility for liens in an amount far exceeding John's portion of the net proceeds does not

automatically render the trial court's allocation improper. For all the reasons discussed above, we do not find an abuse of discretion.

¶ 59    Next, we address John's claim that the trial court erred in calculating his income. He argues that (1) Permix's rental payments for his adult daughter should not have been included in his income; (2) Permix's $475 weekly payments were not consistent, existing only from August 16, 2023, until April 6, 2024, and therefore should not have been included in his income; and (3) because John's income fluctuates wildly year to year, the trial court should have used an income averaging approach to calculate John's income.

¶ 60    The trial court's first step in setting child support and maintenance is to determine each parent's monthly net income. 750 ILCS 5/505(a)(1.5)(A) (West 2024); 750 ILCS 5/504(b-1)(1)(A) (West 2024). On review, we defer to a trial court's "factual finding[s] as to the parties' annual incomes" as long as the findings are not against the manifest weight of the evidence. *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 39.

¶ 61    John's first argument is that Permix's rental payments for his adult daughter should not have been included in his income. We disagree. Both John and Jennifer testified that Permix was paying the rent for John's daughter. Given the trial court's finding that John had virtually unlimited access to Permix's finances and its finding that John "repeatedly attempted to mislead [the] court," we cannot find the trial court's inclusion of the rental payment in John's income to be against the manifest weight of the evidence. Further, when Jennifer's trial counsel elicited the testimony regarding the $5,000 monthly rental payments, John's trial counsel failed to object. When a party procures, invites, or acquiesces to a trial court's evidentiary ruling, even if the ruling is improper, he cannot contest the ruling on appeal. *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 323 Ill. Dec. 475, 489, 893 N.E.2d 949, 963 (1st Dist. 2008), appeal denied. Here,

John acquiesced to the admission of the testimony regarding the $5,000 monthly rental payments. He cannot now claim that it was improper for the trial court to rely on that testimony. Accordingly, the trial court's inclusion of the $5,000 monthly rental payments for John's adult daughter in John's income was not against the manifest weight of the evidence.

¶ 62    John's next argument is that Permix's $475 weekly payments were not consistent, existing only from August 16, 2023, until April 6, 2024, and therefore should not have been included in his income. We disagree. Non-recurring payments constitute income and the non-recurring nature of the payment may factor into the trial court's decision on how to allocate it. *Mayfield v. Mayfield*, 2013 IL 114655, ¶ 24. It follows that inconsistently recurring payments would also constitute income. Here, John's banks statements do show a lack of consistency in these $475 weekly payments. However, the trial court noted that John's testimony regarding his income lacked credibility and determined that he had other accounts that were not disclosed. "We defer to the trial court's determination of credibility because the trial court is in the best position to observe the conduct and demeanor of witnesses." *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042. Given the trial court's credibility findings, it was not improper for the trial court to include the $475 weekly payments from Permix in calculating John's income.

¶ 63    We are not convinced by John's third argument, that the trial court should have used an income averaging approach to calculate John's income. As he notes in his opening brief, if net income is difficult to ascertain or uncertain, the trial court *may* consider past earnings. *Gabriel*, 2020 IL App (1st) 182710, ¶ 40. The use of the word may is permissive, not mandatory. *In re Estate of Ahmed*, 322 Ill. App. 3d 741, 746. Here, the trial court found that John Paul lacked credibility, "repeatedly attempted to mislead [the] court," and "did not make a full disclosure of his accounts." Given John's failure to disclose all of his accounts, an income averaging approach

would not be a sufficient method by which to calculate John's income. For all the reasons discussed above, the trial court was not required to use an income averaging approach and did not err by not using that approach to calculate John's income.

¶ 64 Finally, we address John's claim that the trial court erred in awarding attorney's fees. A trial court's decision to award or deny fees will be reversed only if the trial court abused its discretion. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 207. To the extent our analysis requires statutory interpretation, our review is *de novo. In re Marriage of Dynako*, 2021 IL 126835, ¶ 14.

¶ 65 Generally, it is the incurring party's responsibility to pay their own incurred attorney's fees. *In re Marriage of Streur*, 2011 IL App (1st) 082326, ¶ 36. However, pursuant to 750 ILCS 5/508, the trial court may order one spouse to pay all or part of the other's attorney's fees arising out of the dissolution proceedings. *In re Marriage of Kennedy*, 214 Ill. App. 3d 849, 861. Section 508 of the Act, in relevant part, reads as follows: "At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." 750 ILCS 5/508 (West 2024).

¶ 66 Section 503(j) of the Act reads as follows:

"(j) After proofs have closed in the final hearing on all other issues between the parties (or in conjunction with the final hearing, if all parties so stipulate) and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided, in accordance with the following provisions:

(1) A petition for contribution, if not filed before the final hearing on other issues between the parties, shall be filed no later than 14 days after the

closing of proofs in the final hearing or within such other period as the court orders." 750 ILCS 5/503(j) (West 2024).

¶ 67    Reading Section 508 and Section 503(j) in conjunction, it is clear that a procedural requirement for an award of contribution to attorney's fees is the filing of a petition for contribution. *In re Marriage of Keaton*, 2019 IL App (2d) 180285, ¶ 13; *In re Marriage of Baniak*, 2011 IL App (1st) 092017, ¶ 28; 750 ILCS 5/503(j)(1) (West 2024).

¶ 68    Here, Jennifer filed a petition for contribution to attorney's fees and costs pursuant to 750 ILCS 5/508(b) on April 11, 2024. In it, she argued that John's failure to comply with discovery requests required her to file an emergency motion to compel discovery, thereby incurring attorney's fees and costs. Accordingly, she requested contribution from John for the fees and costs incurred in relation to the discovery issue. It appears as though this is the only petition for contribution to attorney's fees and costs Jennifer filed. In her written closing argument, she states:

> "Jennifer is seeking contribution to attorney fees. To date, my law firm has billed for over $20,000 for engaging in two pre trials, filing discovery related motions and preparing and executing a trial. Jennifer still owes money to a previous attorney and will be forced to relocate after the sale of the house. Jennifer is not in a position to pay these fees and has an income literally a fraction of that of John Paul. *** Jennifer had previously filed a motion for contribution in an attempt to level the playing field, as John Paul had the services of an attorney throughout this entire process. *** Jennifer is asking for $20,000.00 in contribution to her fees."

However, a closing argument is not an opportunity to seek additional relief. We cannot construe this as a petition for contribution under 508(a) or 503(j).

¶ 69    A party cannot be granted relief in the absence of corresponding pleadings. *Ligon v. Williams*, 264 Ill. App. 3d 701. Here, as Jennifer did not file a petition for contribution as required by 750 ILCS 5/503(j) or 750 ILCS 5/508(a), the trial court granted relief that was not properly plead. See *In re Marriage of Walsh*, 109 Ill. App. 3d 171, 177.

¶ 70    Further, Illinois requires that a petition for fees "specify the services performed, by whom they were performed, the time expended thereon, and the hourly rate charged therefor." *Kaiser v. MPEC American Properties, Inc.*, 164 Ill. App. 3d 978, 984. Here, it is impossible to determine with any sort of specificity the amount of time Jennifer's counsel spent on this case as the proper petition for contribution was never filed, nor were any time records or itemized attorney fee statements entered into evidence. Although it is true that the trial court may utilize his or her own knowledge and experience when determining the value of services provided (*In re Marriage of Powers*, 252 Ill. App. 3d 506, 508), there still must be *some* evidence in the record of what those services are. Accordingly, the trial court's award of attorney's fees in the amount of $10,000 was an abuse of discretion and we reverse.

¶ 71                                    III. CONCLUSION

¶ 72    For the reasons stated, we affirm in part; and reverse in part.

¶ 73    Affirmed in part; and reversed in part.